UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHNNY FLOURNOY,

      Plaintiff,

    v.

ESTATE OF SALEH OBAISI, et al.,

      Defendants.

No. 17 CV 7994

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Johnny Flournoy, an inmate at Stateville and Lawrence Correctional Centers, suffered from glaucoma. The Medical Director at Stateville prison, Dr. Saleh Obaisi, wrote Flournoy prescriptions for four eyedrops, to last a year, but told Flournoy that the prison's medical provider, defendant Wexford Health Sources, had a policy of not refilling prescriptions after a few months.[1] On several occasions over the course of a few years, Flournoy went without all of his eyedrops for months at a time. He says his vision got worse as a result. Flournoy brings Eighth Amendment claims against Wexford and Obaisi (the Wexford defendants), and three of the wardens at Stateville and Lawrence (the IDOC defendants), and brings a medical-malpractice claim against Obaisi and Wexford. He also requests injunctive relief. The Wexford and IDOC defendants move separately for summary judgment. For the

---

[1] Obaisi died shortly after Flournoy filed this lawsuit. Obaisi's estate replaced him as the named defendant in the case, but for simplicity, I refer to Obaisi individually as the party.

reasons discussed below, the IDOC defendants' motion is granted, and the Wexford defendants' motion is granted in part, denied in part.

## I.      Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I construe all facts and draw all inferences in favor of the nonmoving party. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 377–78 (7th Cir. 2020).

## II.     Evidentiary Issues and Local Rule 56.1

Under Local Rule 56.1(a)(3), the moving party must provide a statement of facts that it believes entitle that party to judgment as a matter of law. N.D. Ill. Local R. 56.1(a)(3); *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014). The opposing party must then respond to each fact. If the opposing party disputes a fact, it must provide specific references to the record controverting that fact. N.D. Ill. Local R. 56.1(b)(3)(B). The opposing party may also present a separate statement of additional facts. Any fact not properly controverted is admitted. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I also disregard legal arguments in the statements of facts, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006), and additional facts

included in response to the asserted fact that do not controvert that fact. *See, e.g.*, [101] ¶¶ 40, 41, 42, 43; [111] ¶ 6; [113] ¶¶ 5, 7, 12.[2]

Both sets of defendants object to facts Flournoy asserts in his statement of additional facts that cite to his sworn declaration as support for evidence about his symptoms and treatment; since Flournoy is not a doctor, defendants say, he cannot offer medical opinions. *See, e.g.*, [111] ¶¶ 1, 9, 26, 27, 28; [113] ¶ 27. I ignore Flournoy's medical opinions—for example, when he asserts what caused his symptoms based on only his own testimony—but admit his observations of what he felt and saw. Describing his symptoms is not the same as offering a medical opinion. *See Collins v. Kibort*, 143 F.3d 331, 337 (7th Cir. 1998) ("A witness does not need to be a doctor to discuss his or her health in general terms."). And it is appropriate for Flournoy to rely on his declaration to relay those symptoms. Written testimony can substitute for live testimony on summary judgment. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014).

The IDOC defendants also object to a number of Flournoy's additional facts regarding medical diagnoses and treatment as hearsay. *See, e.g.*, [111] ¶¶ 1, 3, 29. Under Federal Rule of Evidence 803(4), statements that are reasonably pertinent to "medical diagnosis or treatment" and that describe "medical history" or "past or present symptoms or sensations" are not hearsay. Fed. R. Evid. 803(4)(A)–(B). So

---

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Flournoy's responses to defendants' 56.1 statements, [100], [101], and defendants' responses to Flournoy's 56.1 statement, [111], [113], where both the asserted fact and the opposing party's response are set forth in one document.

Flournoy's diagnosis and prescribed medications as told to him by his doctors, and his accounting of his symptoms to a doctor, are not hearsay and are admitted. *See* [111] ¶¶ 1, 3, 29.

The IDOC defendants also object to Flournoy's assertions that he filed emergency grievances, because Flournoy cites to the pleadings for that proposition, not the grievances themselves. *See* [111] ¶¶ 4, 11. Flournoy includes some grievances as exhibits, and cites to them to support a factual assertion, *see* [111] ¶ 24; [113] ¶ 24, but he does not cite to any exhibits themselves as evidence that he filed grievances. Generally, the nonmoving party must go "beyond the pleadings" to show that there is a genuine issue for trial. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 896 (7th Cir. 2018). Evidence considered on a summary judgment motion "need not be admissible in form," so long as it is "admissible in content." *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016). The general assertion that Flournoy filed grievances is within his personal knowledge and something he could testify to at trial. That he does not offer or cite to specific grievances he filed, their substance, or how they were resolved, goes to the weight of the assertion. But defendants' motion to strike the fact that Flournoy filed grievances about his medical care is denied.

The Wexford defendants attempt to controvert some of Flournoy's asserted facts by calling them "self-serving." [113] ¶¶ 20, 24. That is not a valid basis for controverting a fact. Affidavits and other written testimony "by their nature are self-serving." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013). A witness's self-

interest "does not prevent a trier of fact from crediting a statement based on personal knowledge." *Koger v. Dart*, 950 F.3d 971, 974 (7th Cir. 2020). The term self-serving "must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill*, 724 F.3d at 967. So facts supported by Flournoy's deposition, [113] ¶ 29, and a grievance he filed, [113] ¶ 24, are both admitted.

According to Flournoy, Obaisi told him that Wexford had a policy of "short-filling" prescriptions. [111] ¶ 19; [113] ¶ 19. The defendants object to this statement on various grounds: they say it is inadmissible hearsay because it was made by a deceased person; it cannot support the medical-malpractice claim under the state Dead-Man's Act; it was not within Flournoy's personal knowledge; it lacks proper record support; and it was hearsay within hearsay because it contained statements that Obaisi's bosses made to him. [111] ¶ 19; [113] ¶ 19.

The statement is admitted. First, it is supported by the record. Flournoy testified that although Obaisi said he would write a prescription for a year, "under our policy, in three to four months we're going to discontinue it." Obaisi added that, "they discontinue it until it's written up again that you need it." [102-1] 30:8–17, 20–23. Flournoy testified that Obaisi said, "this is the policy of Wexford," [102-1] 30:8–31:8, and, "I have bosses that I have to answer to." Obaisi was "under the instructions of his boss, who's Wexford." [102-1] 30:8–10, 31:5–8.

Second, the statement was not hearsay within hearsay; Obaisi was not repeating a statement that someone else said. He was relaying his perception of

Wexford's practices. Obaisi was a named defendant in this case (later replaced by his estate) and was speaking on a matter within the scope of his agency relationship with Wexford. His statement is the statement of a party opponent. Fed. R. Evid. 801(d)(2). And while Wexford's policies were outside Flournoy's personal knowledge, Flournoy had personal knowledge of what Obaisi said to him.

That Obaisi is now deceased is irrelevant. "A statement by a declarant, deceased at the time of trial, may be admissible" under Rule 801. *Fischer v. Forestwood Co.*, 525 F.3d 972, 984–85 (10th Cir. 2008) (quoting *Savarese v. Agriss*, 883 F.3d 1194, 1201 (3d Cir. 1989)); *see also United States v. Chappell*, 698 F.2d 308, 311–13 (7th Cir. 1983) (statement of defendant's agent who died before trial was admissible as a statement of a party-opponent).

Nor does the Illinois Dead-Man's Act bar the statement as to the medical-malpractice claim. Under that statute, when a deceased person's representative is a defendant, an adverse party may not testify to conversations with the deceased person. 735 ILCS 5/8–201. Federal Rule of Evidence 601 provides that "[e]very person is competent to be a witness" unless the federal rules provide otherwise, except that, in a civil case, state law governs witness competency "regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 601; *Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 570 (7th Cir. 2009). When the statement at issue relates to the federal claims in a given lawsuit, in addition to the state-law claims, Rule 601 applies instead of the state statute. *Suskovich*, 553 F.3d at 570. Rule 601 creates a "broad presumption of competency,"

so a statement relating to both federal and state claims is typically admitted. *Id.*; *see also Horton v. City of Chicago*, 2018 WL 4699790, at *4 n.5 (N.D. Ill. Sept. 30, 2018) ("The Dead Man's Act does not apply to federal claims or where the testimony sought to be excluded relates to overlapping state and federal claims."). Here, state law provides the law of decision for the medical-malpractice claim. But the statement at issue—Obaisi's assertion that Wexford's policy was to discontinue prescriptions after a few months—relates to Flournoy's federal *Monell* claim. Since the state and federal claims overlap, Rule 601 applies over the Dead Man's Act, and the statement is admitted.

On reply, both sets of defendants move to strike some or all of Flournoy's submitted materials, including portions of Flournoy's statement of additional facts as unsupported by the record, as well as his response brief for not citing to the statements of facts. [110] at 1–2; [112] at 1–2. Those motions are denied. Motions to strike are generally disfavored. *See Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989). Particularly at the summary-judgment stage, the court must always review statements of material facts and eliminate any assertions that are unsupported by the record, and striking whole paragraphs runs the risk of discarding properly supported facts along with the unsupported ones. *See Rivera v. Guevara*, 319 F.Supp.3d 1004, 1018 (N.D. Ill. 2018). The proper vehicle for defendants to challenge Flournoy's asserted facts was the responses to Flournoy's statement of additional facts. Defendants' objections were considered and have been resolved as noted. And Flournoy's response brief did not violate Local Rule 56.1, because the rule

does not require parties to cite to the record in their response briefs. To the extent Flournoy offers facts in his brief that he did not also include in his 56.1 statement, I ignore those facts. I rely only on the admitted facts contained in the separate statements of undisputed facts.

## III. Facts

### A. Background

Plaintiff Johnny Flournoy was incarcerated at Stateville Correctional Center from March 2005 until November 2016, when he was transferred to Lawrence Correctional Center. [100] ¶¶ 1, 8–9; [101] ¶ 2. Defendant Wexford Health Sources provided medical services at both Stateville and Lawrence. [101] ¶ 3. Dr. Saleh Obaisi was the Medical Director at Stateville from August 2012 until December 2017, when he died. [101] ¶ 4. Ghaliah Obaisi is the administrator of his estate. [101] ¶ 4. According to Wexford's policies, as Medical Director, Obaisi was responsible for determining the prescriptive practices in the prison and monitoring the levels of stock medication. [111] ¶ 33; [113] ¶ 33.[3] Obaisi also had the discretion to obtain medication from the local pharmacy when a patient's condition made it unacceptable to wait for the medication to be available through the contract pharmacy. [111] ¶ 34; [113] ¶ 34.

---

[3] Wexford and Obaisi dispute this fact but do not cite to the record to controvert it, so the fact is admitted. [113] ¶ 33. Also, they controvert the fact because individual states "may" vary from Wexford's policy, but do not assert that either Stateville or Lawrence in fact deviated from the standard policy.

Defendant Tarry Williams was the warden of Stateville from April 2014 until July 2015. [100] ¶¶ 4, 20. Defendant Randy Pfister was the warden of Stateville from November 2015 until January 2018. [100] ¶¶ 5, 11. Defendant Kevin Kink was the warden at Lawrence from February 2018 to December 2018. [100] ¶¶ 3, 29.

### B. Flournoy's Medical History

In 2000 or 2001, Flournoy was diagnosed as "glaucoma suspect," and, in 2005, he began to experience vision loss. [101] ¶ 17; [111] ¶ 1; [113] ¶ 1.[4] Flournoy had primary open angle glaucoma (POAG). [101] ¶ 14. Patients with POAG have elevated intraocular pressure, which damages the optic nerve. [101] ¶ 14. Glaucoma is asymptomatic and is often not discovered until the optic nerve has already been significantly damaged. [101] ¶ 14. It does not cause vision loss until it reaches an advanced stage. [101] ¶ 14. POAG is treated with medication eyedrops that reduce intraocular pressure. [101] ¶ 15. Some medications, like Timoptic (Timolol) and Latanoprost (Xalatan) drain fluid in the eye, while others, like Brimonidine and Dorzolamide, reduce the fluid production of the eye. [101] ¶ 15. Surgery can also treat POAG. [101] ¶ 16.

Flournoy had multiple surgeries at the University of Illinois Chicago Medical Center, beginning in 2007. [101] ¶¶ 17–19. The parties dispute how damaged Flournoy's eyes were by that point. According to the Wexford defendants' expert

---

[4] Both sets of defendants dispute the fact that Flournoy was diagnosed as glaucoma suspect, even though Wexford and Obaisi offer it in their own statement of fact. [101] ¶ 17. The fact is admitted. The IDOC defendants' objection to Flournoy's diagnosis as hearsay and unsupported by the record is overruled for the reasons discussed above.

witness, Dr. Walter Jay, Flournoy had already experienced "significant deterioration" of his vision in both eyes. [101] ¶¶ 18–19; [81-4] at 10–11. According to Flournoy's expert, Dr. Neil Watkins, UIC records from that time did not make clear "how advanced" Flournoy's glaucoma was or "what level" of damage had occurred. [102-4] 81:18–82:1.[5]

In April 2010 and January 2011, Flournoy had surgery to remove cataracts. [101] ¶ 20. Sometime in 2011, the doctors at UIC told Flournoy he was almost blind in his left eye. [101] ¶ 21.[6] Flournoy had surgeries again in October 2011 and May 2013. [101] ¶¶ 22–23. By May 2013, Flournoy's vision had significantly deteriorated due to optic nerve damage. [101] ¶ 23. In January 2014, Flournoy's vision was 20/40+ in the right eye and 20/70+ in the left eye. [101] ¶ 63. On January 23, 2015, an evaluation at UIC showed Flournoy's vision at 20/60 in the right eye, and 20/70 in the left eye. [101] ¶ 24.

On May 12, 2015, UIC recommended for the first time that Flournoy begin taking four medication eyedrops. [101] ¶ 26. That day, Obaisi wrote a prescription order for them, set to refill for a year, and gave Flournoy a permit for prescription sunglasses. [101] ¶¶ 26–27. By June 2015, Flournoy had advanced glaucoma in his

---

[5] In 2007, Flournoy sued Wexford and the former Medical Director at Stateville for not providing him glaucoma medicine, allowing the optical nerves in his eyes to deteriorate. [101] ¶ 11. That case settled in August 2016. [101] ¶ 11. In 2008, Flournoy sued the same doctor again for not providing him bifocals. [101] ¶ 12. That case also settled. [101] ¶ 12.

[6] The fact is admitted over Flournoy's objection. [101] ¶ 21. Flournoy's deposition supports the defendants' asserted fact. [102-1] 48:16–49:4. Flournoy's testimony about what caused him to be almost blind is an additional fact that does not properly refute the defendants' asserted fact.

left eye and moderate glaucoma in his right eye. [111] ¶ 5; [113] ¶ 5; [102-18] at 42. On June 4, 2015, Flournoy's medical records stated that Flournoy needed to take "all Glaucoma medicine for life to prevent blindness." [111] ¶ 3; [113] ¶ 3; [102-8] at 4. On the next line, the doctor listed Timolol, Brimonidine, Dorzolamide, and Latanoprost. [111] ¶ 3; [113] ¶ 3; [102-8] at 4. The doctor also recommended another surgery on Flournoy's right eye. [101] ¶ 28.

On July 13, 2015, Flournoy underwent surgery. [101] ¶ 29. The surgeon performed a procedure to reduce intraocular pressure by inserting a tube ligated with Vicryl sutures. [101] ¶ 29. Vicryl sutures are dissolvable and do not need to be removed. [101] ¶ 29. The parties dispute whether the surgeon also used a second, nondissolvable type of suture, Nylon sutures. Flournoy's medical records reference both types of sutures being used during the procedure. [81-5] at 25–26.

The day after his surgery, Flournoy returned to UIC for a follow-up appointment. [101] ¶ 31; [113] ¶ 9. The ophthalmologist reported that Flournoy was doing well. [101] ¶ 31. The parties dispute whether Flournoy should have been brought back for another procedure to remove nondissolvable sutures. [101] ¶ 29; [111] ¶¶ 6, 9; [113] ¶¶ 6, 9; [102-4] 104:24–105:14. Wexford and Obaisi say that no follow-up was necessary, citing the ophthalmologist's comment that Flournoy was "doing well" the day after his surgery, and their expert's opinion that the sutures were dissolvable. [101] ¶ 62; [113] ¶ 6. Watkins, Flournoy's expert, concluded that Flournoy should have had a follow-up procedure to remove the sutures. [101] ¶ 29; [102-5] at 8. The parties also dispute whether surgeries like trabeculectomies or

11

shunt placements are reserved only for patients with advanced glaucoma; Dr. John Kay, who treated Flournoy after he transferred to Lawrence, testified that they are performed on patients with advanced glaucoma, while Watkins said the surgeries could be performed on moderate cases too. [101] ¶¶ 48–49; [81-6] 19:19–22; [102-4] 19:3–14. After Flournoy's surgery, the UIC doctor recommended prescriptions for an oral steroid and antibiotic, and Obaisi wrote those prescriptions. [101] ¶ 30.

### C. Flournoy's Access to Eyedrops

The medical staff at Stateville did not administer daily eyedrops; rather, inmates kept the eyedrops on them or in their cells and administered the medicine themselves. [101] ¶ 5. If an inmate needed a refill, he would put a sticker on a piece of paper and submit it to a box that went to the Health Care Unit seven days before he needed the refill. [101] ¶ 6. Flournoy received eyedrops in a bottle that was supposed to last a month. [101] ¶ 7. He would often miss his eye when administering the drops, so each bottle typically lasted for 20–22 days. [101] ¶ 7; [111] ¶ 8; [113] ¶ 8. Flournoy put his refill requests in at least two weeks ahead of the refill date. [111] ¶ 31; [113] ¶ 31. To get a prescription renewed, instead of just refilled, Flournoy had to request an appointment with Obaisi. [101] ¶ 8. Flournoy believed a Wexford employee named Regina was responsible for ordering medicines from the pharmacy. [101] ¶ 45.

Obaisi told Flournoy that Wexford had a policy of discontinuing prescriptions early, meaning that even if a prescription was written for a certain time period, Wexford would stop refilling the prescription before the full time elapsed. [111] ¶ 19;

[113] ¶ 19. The parties dispute whether Flournoy timely received his eyedrops. According to Flournoy, he consistently received them late or not at all. [111] ¶ 20; [113] ¶ 20. Defendants point to Obaisi's records from July 28, 2015, which state that Flournoy's medications "dispensed today from pharmacy." [101] ¶ 32; [111] ¶ 6; [113] ¶ 6; [81-5] at 30. Flournoy received one of his medications, Brimonidine, a few days later, on July 31, 2015. [102-2] ¶ 138. He then received a refill on August 14, 2015, but did not receive the medication again until February 29, 2016. [111] ¶ 7; [113] ¶ 7; [102-2] ¶¶ 147, 255. Flournoy saw Obaisi to treat a skin rash on September 1, 2015; at that appointment, Flournoy did not complain about vision issues or his eyedrop prescription. [101] ¶ 33. In November 2015, Obaisi renewed Flournoy's medical permit for his prescription sunglasses, and, in May 2016, Obaisi entered an order to renew the four medical eyedrops the ophthalmologist had prescribed with refills for one year. [101] ¶¶ 34–35. Flournoy thereafter received regular refills for one of the medications that he was prescribed. [111] ¶ 21; [113] ¶ 21. He received refills for Dorzolamide, Timolol, and Xalatan on May 7, 2016, June 3, 2016, and June 6, 2016, respectively. [111] ¶ 21; [113] ¶ 21. But the medicines were not refilled again until late October, when he met with La Tanya Williams, a physician's assistant, to discuss his complaints about not receiving his refills. [101] ¶ 37; [111] ¶¶ 21–22; [113] ¶¶ 21–

22. Williams called the pharmacy, which said that the eyedrops would be dispensed that day. [101] ¶ 37.[7]

Also in October 2016, Obaisi noted in Flournoy's medical records that he was discontinuing Flournoy's medical hold. [101] ¶ 36. Flournoy transferred to Lawrence on November 4, 2016, and the parties dispute whether Flournoy received his eyedrops after transferring. According to Flournoy, he did not receive them until December 9, 2016. [111] ¶ 10; [113] ¶ 10. The Wexford defendants dispute this assertion based on an "Offender Health Status Transfer Summary," in which a Stateville nurse made note of Flournoy's prescription eyedrops. [101] ¶ 39; [113] ¶ 10. The nurse at Lawrence who reviewed Flournoy's intake chart also noted the four prescriptions. [101] ¶ 39.

In February 2017, Flournoy was referred to Effingham Ophthalmology Associates for a consultation and examination by Kay. [101] ¶ 40; [111] ¶¶ 13–14; [113] ¶¶ 13–14. Kay never reviewed Flournoy's medical history and never spoke with anyone from either prison about Flournoy's treatment. [111] ¶¶ 13–14; [113] ¶¶ 13–14. At an exam in February 2017, Kay measured Flournoy's visual acuity at 20/40+ in his right eye and 20/70+ in his left eye. [101] ¶¶ 40, 63. Flournoy's intraocular pressure was 12 in the right eye and 9 in the left eye, which Kay said was low for a patient with advanced-stage glaucoma. [101] ¶¶ 40, 63. Kay wrote a prescription for

---

[7] The Wexford defendants dispute Flournoy's assertion that he had not received his eyedrops before October 28 by pointing out that the refills were dispensed on October 28. [113] ¶¶ 21–23. But what happened on October 28 is nonresponsive to Flournoy's assertion about what occurred before that date. [113] ¶¶ 22–23. The facts are admitted.

spectacles. [101] ¶ 40. Flournoy received those glasses in July 2017. [111] ¶ 26; [113] ¶ 26. From May to July 2017, Flournoy's prescriptions were not refilled. [111] ¶ 24; [113] ¶ 24.[8]

Kay examined Flournoy again in February 2018, and Flournoy did not complain at that time about not receiving his eyedrops. [101] ¶ 41. His vision was 20/40 in the right eye and 20/100 in the left eye, which was unchanged from the prior visit. [101] ¶ 41. His intraocular pressure was 13 in the right eye and 9 in the left. [101] ¶ 41. Kay said that Flournoy was "doing exceptionally well given his condition." [101] ¶ 41. Kay examined Flournoy again in August 2018. [101] ¶ 42. At that point, his vision tested at 20/40 in the right eye and 20/100 in the left; intraocular pressure was 14 in both eyes. [101] ¶ 42. Kay saw Flournoy again in July 2019, and twice in August 2019. Flournoy had "no problem" with Kay. [101] ¶ 46.

### D. Flournoy's Communications with the Wardens

Flournoy filed grievances with prison staff at Stateville and Lawrence in 2015 and 2017. [111] ¶¶ 4, 11; [113] ¶¶ 4, 11. The wardens were not medical professionals, had no special medical training, and were not involved in providing medical care to

---

[8] The IDOC defendants dispute this fact by stating that it is "not relevant or material to the issues." [111] ¶ 24. Relevant evidence is any evidence that tends to make a fact more or less probable. Fed. R. Evid. 401(a). The issue in this case is whether the defendants were deliberately indifferent to Flournoy's medical needs, and whether his eyedrop prescription was filled is not only relevant, but central to the case. They also label the fact "hearsay." Flournoy relies on a grievance he filed to support his assertion that his prescriptions were not refilled. As noted above, evidence on summary judgment must be admissible in substance, but not in form, and whether Flournoy received his medication is within his personal knowledge. The defendants do not argue that the grievance lacks indicia of reliability, or isn't what Flournoy purports it to be. It is admissible as a record kept in the ordinary course of a business or organization. Fed. R. Evid. 803(6).

inmates or making treatment decisions. [100] ¶¶ 12–14, 21–22, 32.[9] When Pfister or Kink became aware of an inmate's medical issue, they typically deferred to the judgment of the prisons' medical staff. [100] ¶¶ 15, 33.[10] If an inmate complained directly to Pfister or Williams about medical care, both wardens' typical practice was to refer the matter to the healthcare staff. [100] ¶¶ 19, 28. Neither Williams nor Kink personally reviewed inmate grievances; they both appointed designees to review, respond to, and sign inmate grievances, correspondence, and grievance officers' reports for them. [100] ¶¶ 26, 30.[11]

The parties dispute whether Flournoy ever talked to any of the three warden defendants about his medical issues. It is undisputed that none of them remembered Flournoy or his medical condition. [100] ¶¶ 16, 23, 34. Neither Pfister nor Williams remembered talking to Flournoy about issues with his prescriptions, or appointments at outside facilities. [100] ¶¶ 18, 27. And Williams did not remember personally reviewing any emergency grievances from Flournoy regarding issues with his medical care at Stateville. [100] ¶ 25. According to Flournoy, he spoke to all three wardens personally about his struggles obtaining medical care when the wardens made rounds

[9] Flournoy admits that the wardens were not involved in providing medical care, but disputes the fact in part because the wardens had a "constitutional responsibility to the inmates." [100] ¶¶ 14, 22. That is not responsive to the asserted fact, and whether the wardens had a constitutional responsibility is not a factual issue. The fact is admitted.

[10] Flournoy does not properly dispute these facts, *see* [100] ¶¶ 15, 33, because what Pfister and Kink did in Flournoy's individual case is not responsive to their general practices, which is what the facts assert.

[11] That Flournoy recalls talking to Williams and Kink about his medical care does not mean that either warden personally reviewed any particular grievance he filed. The fact is admitted.

16

at the prisons. [102-2] ¶¶ 577–78. Flournoy complained to Pfister several times about not receiving his medication, and Pfister responded, "I know about you Flournoy, put in a grievance." [102-2] ¶ 581; [102-1] 144:14–16. Further, Flournoy introduced himself to Kink and gave Kink a summary of his medical condition and his "problems receiving care." [102-2] ¶ 582. Kink told Flournoy that he would look into Flournoy's issues if he put them in writing, so Flournoy filed emergency grievances. [102-2] ¶ 582. Flournoy would "try to" talk to Williams in person. [102-2] ¶ 583. After Flournoy's emergency grievances were denied, he "talked to the wardens personally," including Pfister. [102-1] 39:18–22. Pfister and other wardens told Flournoy that they had consulted with Obaisi, who said Flournoy's grievance "wasn't an emergency." [102-1] 39:18–22. Flournoy had these conversations with "all the wardens in Stateville," but mentioned only Pfister and a warden named Lemke by name. [102-1] 39:18–40:4.

### E. Flournoy's Injuries

The parties dispute whether Flournoy has suffered vision loss since 2015. [111] ¶¶ 35–36; [113] ¶¶ 35–36. According to Flournoy, his vision has worsened, and he began to experience dark spots and difficulty seeing words, even with a magnifying glass. [111] ¶ 27; [113] ¶ 27. He also experienced severe pain in his head, eyes, and temple. [111] ¶ 28; [113] ¶ 28. At an ophthalmological evaluation in January 2018, Flournoy reported eye pain, that he was unable to see, and light sensitivity. [111] ¶ 29; [113] ¶ 29. He had another surgery in 2019. [111] ¶ 27; [113] ¶ 27. The parties dispute whether headaches, dizziness, and vertigo are symptoms of glaucoma, as

17

Flournoy asserts. [101] ¶¶ 50, 52–53. According to Watkins, dizziness and vertigo are "not normally" symptoms of glaucoma, and glaucoma can "possibly" cause headaches, depending on whether the patient has recently had surgery. [102-4] 76:21–78:10.

The parties dispute the characterization of Watkins's findings in his expert report. Flournoy says that Watkins concluded that he suffered vision loss as a result of not receiving his medication. [111] ¶ 36; [113] ¶ 36. But Watkins's report doesn't say that. [102-5] at 7. Watkins concluded that Wexford and Obaisi did not provide Flournoy with "medical treatment outside of his ocular surgeries of the kind required in order to minimize and prevent glaucoma from causing blindness," and that failure to provide all four prescription eyedrops "is below the standard of care" and "can accelerate blindness." [102-5] at 7, 9. He further concluded that "[l]eaving any type of glaucoma untreated will result in permanent vision loss" as it "appears was done by Wexford and its agents." [102-5] at 8. Finally, Watkins stated that "no medical drops" "will definitely lead to loss of visual field from irreversible optic nerve damage and eventually total blindness." [102-5] at 9.

At his deposition, Watkins compared Flournoy's exam results from January 2015 and February 2017, and acknowledged that Flournoy's visual acuity was the same in his left eye at both times and, in 2017, was slightly better in his right eye. [101] ¶¶ 54, 58. Watkins said that after Flournoy's July 2015 surgery, his intraocular pressure level was acceptable. [101] ¶ 55. And Watkins said that Flournoy's intraocular pressure at a 2018 exam was good. [101] ¶ 59. But Watkins also testified that Flournoy's intraocular pressure might appear stable at any given moment,

18

because Flournoy may have been on the eyedrops when the test was administered. [111] ¶ 30; [113] ¶ 30; [81-3] 96:4–97:16. Watkins said the better measure was if the nerves had "gotten worse." [81-3] 96:4–97:16. When asked whether he had any objective evidence indicating that Flournoy's condition had worsened, Watkins said he "did not have any tests here to say." [101] ¶ 56; [81-3] 97:13–21. Likewise, when asked if he had any objective evidence that Flournoy suffered optic nerve damage since July 2015, Watkins said he did not "have that in front of me." [101] ¶ 57; [81-3] 122:2–6.

According to Jay, Wexford and Obaisi's expert, by the time Flournoy had surgery in 2015, he already had advanced glaucoma with associated vision loss. [101] ¶ 61. Jay concluded that Flournoy did not suffer any vision loss or progression of his glaucoma between July 2015 and being seen at Effingham Ophthalmology in February 2017. [101] ¶ 63; [113] ¶ 35. And Flournoy's intraocular pressure numbers at the 2017 appointment suggested that Flournoy's condition was stable. [101] ¶ 63. He added that all four of Flournoy's medications had the same goal, which was to reduce fluid in the eye and thereby reduce intraocular pressure. [101] ¶ 64. In his opinion, prescriptions should only be renewed once or twice a year, and patients have responsibility to renew their prescriptions. [101] ¶ 65. According to Jay, Flournoy's headaches and balance issues were not related to his ocular issues. [101] ¶ 66.

## IV.   Analysis

Flournoy brings four claims. He moves for injunctive relief against Wexford and Kink (Count I) and brings claims for an Eighth Amendment violation under 42

U.S.C. § 1983 against Wexford (Count II) and Obaisi's estate, Kink, Pfister, and Williams (Count III).[12] He also brings a medical-malpractice claim against Obaisi's estate and Wexford (Count IV). He asks for both compensatory and punitive damages in Counts II–IV.[13]

## A. Deliberate Indifference

The Eighth Amendment prohibits deliberate indifference to the serious medical needs of prisoners. *Machicote v. Roethlisberger*, 969 F.3d 822, 827 (7th Cir. 2020) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). An inmate alleging deliberate indifference must show that he faced a "substantial risk of serious harm," and that prison officials knew about that risk and disregarded it by "failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Murphy v. Wexford Health Sources Inc.*, 962 F.3d 911, 915 (7th Cir. 2020). The defendants here do not dispute that Flournoy's glaucoma was objectively serious, so only the subjective component of the test is at issue.

To establish the necessary state of mind, Flournoy must offer evidence that the defendants knew facts from which they could infer that a substantial risk of serious harm existed, and that they did, in fact, draw that inference. *Walker v. Wexford*

---

[12] Flournoy also names Nicolas Lamb as a defendant in Count III. [44] at 1, 10. Lamb did not join the other IDOC defendants' motion for summary judgment and was unable to supply a declaration within the time scheduled for dispositive motions. [75], [88].

[13] The parties dispute the time period that this lawsuit covers, and Wexford and Obaisi ask the court to limit the claim to 2015 and later. See [101] ¶ 13; [112] at 8. Flournoy disputes the Wexford defendants' asserted fact that his lawsuit begins in 2015, [101] ¶ 13, but the operative, admissible facts Flournoy offers are exclusively about his medical care in 2015 and beyond.

*Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019). "Deliberate" means something more than negligence, but less than purposeful. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir.), *cert. denied*, 140 S. Ct. 50 (2019). It is "something akin to recklessness." *Id.* (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)).

When a plaintiff alleges that a defendant delayed, rather than denied, medical treatment, he must present "verifying medical evidence" that the delay, not the underlying condition, caused "some harm." *Walker*, 940 F.3d at 964 (quoting *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013)). And the plaintiff must show that the defendant's actions or inaction "caused the delay in his treatment." *Id.* Expert testimony that the plaintiff suffered because of a delay in treatment qualifies as verifying medical evidence, but it is not the only way a plaintiff can make that showing. *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007). If the evidence "falls somewhere in between a bare recitation of treatment received" and "expert testimony about the delay's effect," that is sufficient to survive summary judgment on whether the delay caused harm. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (quoting *Williams*, 491 F.3d at 714–15) (medical records without expert testimony were enough to meet verifying medical evidence standard).

### 1. Obaisi

Medical professionals are generally entitled to deference in treatment decisions. That is because the "permissible bounds of competent medical judgment" can be unclear, since treatment decisions are fact-based depending on the specific needs of a particular inmate. *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en

banc). Thus, disagreement between a prisoner and his doctor about the proper course of treatment is generally insufficient to establish an Eighth Amendment violation. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

To be liable for an alleged deprivation of constitutional rights, a defendant must be "personally responsible" for the deprivation. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). That requirement is satisfied if the constitutional violation occurs at a defendant's "direction or with her knowledge or consent." *Id.* Even if a defendant did not "take part" in the constitutional deprivation, he may nevertheless be liable if he "acquiesced in the failure to provide necessary medical treatment." *Id.*; *see also Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010).

As a threshold matter, a jury could find that Flournoy went without all four eyedrops for some periods of time. His testimony, along with the testimony of the physician's assistant who called the pharmacy on Flournoy's behalf when he stopped receiving three of his medications in 2016, would support the finding. Defendants' only evidence to rebut Flournoy's assertions is that Obaisi wrote the prescriptions for the eyedrops. But whether Obaisi wrote the prescriptions, and whether Flournoy actually received monthly refills as prescribed, are separate issues. There is evidence from which a jury could find that Flournoy repeatedly did not receive his medication on time.

There is a genuine dispute of fact about whether Obaisi was personally involved in depriving Flournoy of his eyedrops. A jury could find that Obaisi knew Flournoy faced a serious risk of harm. There is no dispute that Flournoy needed the

22

eyedrops. Obaisi, as the person who wrote the prescriptions, was aware that not providing them posed some risk to Flournoy. Further, there is evidence that Obaisi knew that Flournoy would not receive the refills for the full year. Obaisi said as much when he told Flournoy that he would write a year-long prescription, but Wexford would discontinue the prescription after three or four months.

A jury could likewise find that Obaisi had the ability to remedy the situation, and, by not acting, he acquiesced in the failure to provide necessary medical treatment. According to Wexford's policies, the Medical Director was responsible for monitoring the levels of medication at the prison, and could obtain medication from the local pharmacy. Yet Obaisi did nothing to ensure that Flournoy received the medication consistently as prescribed. This is not a case in which Obaisi exercised his medical judgment, and Flournoy simply disagreed with the chosen course of treatment. Obaisi knew that Flournoy needed certain medication, acknowledged that writing the prescription alone was inadequate, and did nothing to abate that failure in treatment. On this record, a jury could find that Obaisi had knowledge of and consented to a constitutional deprivation.

A jury could also find that Obaisi was not personally involved. Flournoy testified that another employee was responsible for ordering medications from the pharmacy. In October 2016, when Flournoy saw a physician's assistant to complain about not receiving his medications, it was the physician's assistant who called the pharmacy and had the medications dispensed. And it's not clear from the record whether and to what extent Flournoy tried to tell Obaisi that his medications weren't

23

being refilled. Further, a jury could find that Obaisi was, overall, appropriately responsive to Flournoy's medical needs. In considering whether a prison official was deliberately indifferent to serious medical needs, courts look to the "totality of an inmate's medical care." *Petties*, 836 at 728–29. Obaisi wrote a prescription order for the eyedrops the day Flournoy was prescribed them, set to renew for one year. A few months later, when Flournoy had surgery, Obaisi wrote the prescription for Flournoy's post-surgery medications. In May 2016, Obaisi wrote another prescription order for the eyedrops. Finally, Flournoy's evidence that Obaisi knew he would not get his medication as prescribed boils down to only one statement. That Obaisi is not available to defend or clarify that statement could lead a jury to discount it. But a court on summary judgment must refrain from "weighing the evidence or deciding which inferences to draw from the facts." *Shaffer v. Am. Med. Assn.*, 662 F.3d 439, 446 (7th Cir. 2011); *see also Hackett v. City of S. Bend*, 956 F.3d 504, 507 (7th Cir. 2020) ("In fact-intensive cases, credibility traps abound, and courts must be alert to avoid them."). When "competing reasonable inferences" can be drawn from the record, summary judgment is not appropriate. *Shaffer*, 662 F.3d at 445.

There is also a triable issue of fact about whether Flournoy's missing eyedrop refills caused him harm. Flournoy says he suffered two injuries: pain and suffering, and accelerated vision loss. A jury could not find on this record that Flournoy's difficulty obtaining his eyedrops caused him pain and suffering. He has presented no medical evidence to support the idea that the medicine was designed to alleviate pain. Watkins's report only addresses accelerated vision loss as a consequence of not

receiving glaucoma medication, and notes that glaucoma generally results in "no pain or discomfort." [102-5] at 7. Watkins testified at his deposition that headaches are not normally a symptom of glaucoma. And the defendants' expert, Jay, opined that Flournoy's headaches were unrelated to his glaucoma.

But a jury could find that Flournoy suffered vision loss as a result of not receiving all four eyedrops consistently. When UIC first prescribed them, Flournoy's doctor wrote that Flournoy "will continue to have vision loss if medicine not given daily." [102-8] at 3. The same doctor wrote that Flournoy "needs all Glaucoma medicines for life to prevent blindness." [111] ¶ 3; [113] ¶ 3; [102-8] at 4. According to Watkins's report, Wexford and Obaisi did not provide Flournoy with the treatment required to prevent his glaucoma from causing blindness. He opined that leaving glaucoma untreated, "as it appears was done by Wexford and its agents," would "definitely" result in irreversible damage to the optic nerve and eventually total blindness. [102-5] at 8. Finally, Flournoy insists that his vision has worsened since 2015, when he began to experience dark spots and difficulty seeing words. Flournoy's statement standing alone could not support the assertion that delay in receiving his medication caused him vision loss, but a jury could consider it in conjunction with his medical records and Watkins's opinions. To be sure, Flournoy has not presented medical evidence conclusively saying that the failure to provide him eyedrops in fact damaged his optic nerve and caused him vision loss. But I draw all reasonable inferences in Flournoy's favor at this stage of the case, and Flournoy has presented enough evidence from which a jury could find that the deprivation of all four

medications harmed him. Flournoy's doctor prescribed him the medication to "prevent blindness," and warned that if the medication was not administered daily, Flournoy would lose his vision. Watkins concluded that not providing regular eyedrops would "definitely" lead to blindness. Taken together with Flournoy's own testimony about his worsening vision, it is a reasonable inference that when Flournoy did not receive his eyedrops for months at a time, his vision worsened—the exact effect that the medication was intended to slow or prevent.

There is also evidence to suggest that not receiving the eyedrops made no material difference to Flournoy's condition. Flournoy began to experience vision loss as early as 2005; the Wexford defendants' expert, Jay, found that Flournoy's vision had already significantly deteriorated by 2007; and Flournoy himself testified that in 2011, his doctors said he was almost blind in one eye. Jay concluded that Flournoy did not suffer any vision loss between his July surgery and being seen at Effingham Ophthalmology in February 2017. Wexford also relies on Flournoy's test results at various points to cast doubt on Flournoy's claim that his vision deteriorated after 2015. Specifically, his visual acuity and intraocular pressure test results were roughly the same in January 2015 and February 2017.

Wexford and Obaisi make much of Watkins's deposition testimony, but they overstate the significance of the excerpts they rely on. [80] at 16. For example, Watkins did testify that Flournoy's intraocular pressure was stable in February 2017, as defendants say. But Watkins also said that intraocular pressure was not a good measure of whether Flournoy was "doing well," because Flournoy may have been on

the eyedrops when the test was administered, and measuring pressure at "one second during the day" didn't tell Watkins "what it is during the other thousands of seconds during the day." [81-3] 96:4–97:16. What mattered was "if the nerves" had "gotten worse or not." [81-3] 96:4–97:16. Notably too, UIC had not prescribed the eyedrops yet in January 2015, and Flournoy does not complain that, in February 2017, he was not receiving his eyedrops. So it's reasonable to infer that Flournoy may have been on his medication at the time of the 2017 exam.

Likewise, Watkins testified that Flournoy's visual acuity was unchanged between 2015 and 2017. But he also added, "You can't use visual acuity" as a "measure of glaucoma in terms of progression." [81-3] 122:2–12. At the same time, Watkins testified that he had no objective evidence in front of him to show that Flournoy suffered optic nerve damage after his 2015 surgery. Neither side offers evidence proving that Flournoy's optic nerve was or was not damaged after 2015. And as noted above, when a jury could draw competing inferences, I must draw inferences in Flournoy's favor. Summary judgment is denied as it relates to the delay in providing eyedrops.

Obaisi's motion is granted on Flournoy's other allegations of deliberate indifference. It is undisputed that Obaisi lifted Flournoy's medical hold in October 2016. But Flournoy's allegation that Obaisi did so in retaliation is underdeveloped and unsupported by the record. Flournoy has presented no evidence that Obaisi's lifting Flournoy's medical hold caused his transfer in the first place, that Obaisi did so knowing that it would result in some harm to Flournoy, or that Obaisi sought to

27

retaliate against Flournoy, as Flournoy argues. Flournoy does not cite to any of the Rule 56.1 statements (or the record itself) to support these allegations. The Wexford defendants mention the medical hold only briefly in their statement of facts, and Flournoy's statement of additional facts doesn't mention it at all. Further, a jury could not find on this record that Flournoy's transfer to Lawrence, in and of itself, resulted in some harm to him. While Flournoy asserts in his response brief that Lawrence is "non-ADA complaint," he provides no citation to support that assertion. [98] at 10. There is evidence that Flournoy did not receive all of his medications at Lawrence, but that was the situation at Stateville as well, so Flournoy fails to establish that transferring resulted in some additional harm to him. And Flournoy testified that he had no problem with Kay, the doctor at Lawrence. No jury could find that Obaisi neglected Flournoy's medical needs when he lifted the medical hold.

Flournoy also alludes to Obaisi's deliberate indifference in failing to bring Flournoy to UIC for "follow-up appointments and treatments." [98] at 3. There is a factual dispute about whether Flournoy needed sutures removed after his 2015 surgery. Defendants' expert opined that Flournoy did not require any follow-up, while Flournoy's expert concluded the opposite. But that example cannot support Flournoy's deliberate-indifference claim against Obaisi (or anyone else), because he presents no evidence that Obaisi knew Flournoy should have been brought back to UIC and disregarded the risk of harm to him. Obaisi was not the surgeon, and there is no evidence that Obaisi knew about the different types of sutures the surgeon used, which ones were dissolvable, or any harm that Flournoy allegedly suffered from not

being brought back to UIC. Nor does he present evidence that it would have fallen on Obaisi to ensure Flournoy was returned to UIC for that procedure.

Summary judgment is granted to Obaisi on Flournoy's claims of lifting the medical hold and not providing follow-up surgery. Because there are genuine disputes of fact about whether Obaisi personally deprived Flournoy of his medication, and whether that deprivation caused Flournoy harm, summary judgment is denied on those issues.

   2. *Williams*

Williams's motion for summary judgment is granted. Williams was the warden of Stateville from April 2014 until July 2015. The conduct that Flournoy argues constituted deliberate indifference began in mid-2015. The eyedrops were prescribed in May, and the medications dispensed from the pharmacy in July. Williams was not the warden at Stateville after July 2015, so a jury could not find that he disregarded a risk to Flournoy in late 2015, 2016, or 2017. Flournoy offers no evidence about deficiencies in care he received before mid-2015.

Beyond the timing, Flournoy has not offered evidence from which a jury could find that Williams had actual knowledge of Flournoy's medical issues. Williams did not remember ever talking to Flournoy about his prescriptions, and never personally reviewed any emergency grievances from him. Flournoy fails to rebut Williams's testimony—although he says he personally talked to each of the warden defendants, his actual testimony was that he would "try to" talk to Williams when Williams was making his rounds. Flournoy also points to grievances that he filed to show that each

of the wardens knew that he was not receiving his medications. But the evidence on that front is vague. In his Rule 56.1 statement, he asserts that he filed grievances on certain dates, relying on the allegations in the amended complaint to support that assertion. He also attaches some grievances as exhibits, but not all of the grievances he refers to are included in his exhibits, and he never offers specific facts about particular grievances, when he filed them, with who, their content, or their outcomes. Absent more specific evidence about his grievances, they do not advance Flournoy's argument as to the wardens' knowledge.

Even if Flournoy had more specific evidence about communicating with Williams, Williams's practice was to refer grievances about medical treatment to the healthcare staff at Stateville. Generally, "non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles*, 914 F.3d at 1049. That is true even when the inmate has filed grievances alleging that he is receiving inadequate treatment, so long as the nonmedical official does not ignore the grievance completely, but refers it to the medical staff. *Id.* at 1050 (citing *Hayes v. Snyder*, 546 F.3d 516, 527–28 (7th Cir. 2008)). Flournoy offers no evidence that Williams was personally involved in his medical care. Williams was not a medical professional, and if he knew about Flournoy's obstacles to obtaining medical care, he was entitled to refer those issues to the medical personnel at the prison and rely on their judgment. Williams's motion for summary judgment is granted.

### 3. Pfister

Pfister was the warden of Stateville from November 2015 until January 2018. There is some factual dispute about Pfister's knowledge of Flournoy's medical issues. Pfister claimed that he did not remember ever talking to Flournoy, but Flournoy said he personally talked to Pfister several times about not receiving his medication, and Pfister told him to file a grievance about it. Flournoy talked to Pfister again after some of his grievances were denied, and Pfister reported that Obaisi had deemed Flournoy's grievances nonurgent.

A jury could credit Flournoy's version of events and find that Pfister knew Flournoy was not getting his medication. But Flournoy has not shown that Pfister was deliberately indifferent. Flournoy's own testimony established that Pfister referred his complaints to the medical staff, then followed up with them. As noted regarding Williams, a prison official may rely on the judgment of medical personnel. *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). It was reasonable for Pfister to rely on Obaisi's judgment, so a jury could not find that Pfister was deliberately indifferent to Flournoy's medical needs. Pfister's motion for summary judgment is granted.

### 4. Kink

Kink's motion for summary judgment is also granted. Kink was the warden at Lawrence from February 2018 to December 2018. Flournoy presents no evidence about deficient medical care he received at Lawrence between February and December 2018. The most recent period in which he says he did not receive his

eyedrops was May to July 2017. And when Kay examined Flournoy in February 2018, Flournoy did not complain about not receiving his medication; Kay thought Flournoy was doing exceptionally well at that time. Flournoy said he talked to Kink personally about his problems receiving care. [102-2] ¶ 582. Kink told Flournoy that he would investigate Flournoy's issues if he put them in writing, so Flournoy says he filed emergency grievances. [102-2] ¶ 582. But Flournoy does not offer evidence that he filed any particular grievance between February and December 2018; he alludes only to ones he filed earlier. *See* [111] ¶ 4; [113] ¶ 4 (describing grievances filed from 2012–2015); [111] ¶ 11; [113] ¶ 11 (describing grievances filed in 2017). Finally, like the other two wardens, even if Flournoy could show that he had experienced an issue when Kink was warden, and that Kink knew about it, Kink would have been justified in relying on the judgment of medical staff. Flournoy may have named warden Kink solely for the purpose of his original request for injunctive relief, but relief is not warranted without liability. Flournoy has not presented evidence from which a jury could find that Kink was deliberately indifferent to his medical needs—it's not clear what Flournoy's medical needs even were when Kink had any oversight over him.

   5. *Wexford*

   When a plaintiff sues a private corporation acting under state law for deliberate indifference under § 1983, the framework of *Monell v. NYC Soc. Serv.*, 436 U.S. 658 (1978) applies. *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020); *Walker*, 940 F.3d at 966. Flournoy must present evidence from which a jury could find that Wexford's policy or custom caused his injury. *Spiegel v. McClintic*, 916 F.3d 611, 617

(7th Cir. 2019); *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). He can make that showing in one of three ways: through a policy that the entity's officers officially adopted and promulgated; through a widespread practice that was so permanent and well-settled that it constituted a custom or practice despite not being expressly adopted; or through an allegation that a person with final policymaking authority caused the constitutional injury. *Spiegel*, 916 F.3d at 617; *Glisson*, 849 F.3d at 379.

To prevail on a custom-or-practice claim, Flournoy must show that Wexford's practice of prematurely discontinuing prescriptions violated his constitutional rights, and that the practice was "so pervasive" that acquiescence on the part of policymakers was "apparent and amounted to a policy decision." *Hildreth*, 960 F.3d at 426 (quoting *Phelan v. Cook Cty.*, 463 F.3d 773, 789, 790 (7th Cir. 2006)). It is difficult, but not impossible, for a plaintiff to show a widespread custom or policy based solely on his own experience. *Id.* There is no bright-line threshold for how many instances a single plaintiff must prove to establish that a practice is widespread, but it generally must be more than three. *Id.*; *see also Grieveson*, 538 F.3d at 774–75. Flournoy must also show that policymakers knew and failed to correct the practice, *Hildreth*, 960 F.3d at 426, and that Wexford's conduct was the "moving force" behind his injury. *J.K.J. v. Polk Cty.*, 960 F.3d 367, 377 (7th Cir. 2020) (en banc). That is, he must demonstrate a direct causal link between Wexford's action or inaction and his injury. *Id.*

Flournoy does not argue that Wexford had a policy of failing to return inmates for follow-up procedures or lifting medical holds; the only policy at issue is Wexford's

33

alleged practice of discontinuing prescriptions before they expired. Flournoy categorizes Wexford's action as a "policy," because that's how Obaisi allegedly described it. But Flournoy does not argue that Wexford had an official, sanctioned policy (and there is no evidence to that effect). In context, Obaisi's reference to Wexford's policy is better understood as describing an unofficial, widespread custom or practice. Flournoy also argues that Obaisi had final policymaking authority.

A jury could find that Wexford had a pervasive practice of not refilling prescriptions for their full length of time. First, Obaisi directly admitted to Flournoy that Wexford's default approach was to discontinue prescriptions after a few months, even when a prescription was written to be refilled for longer. That Flournoy did not receive all four eyedrops on multiple occasions, and in two different prisons run by Wexford, corroborates Obaisi's statement. The parties agree that Obaisi wrote the eyedrop prescription in May 2015, and that Obaisi noted that the medication dispensed from the pharmacy on July 28, 2015. Flournoy then received a refill of Brimonidine on August 15, but did not receive a refill again for six months, until the following February. A few months later, he stopped receiving refills of the other three medications, and went without them from June to October 2016, when a physician's assistant called the pharmacy. Flournoy was transferred a few days later, and, after his November 4 transfer, he did not receive his eyedrops until December 9. A few months later, from May to July 2017, his prescriptions were not refilled. Thus, Flournoy has identified at least four stretches of time when he did not receive the refills for all four medications. And unlike cases in which the plaintiff's experience

constitutes the sole evidence of a widespread custom, here, Flournoy offers not just his own experience, but also Obaisi's explicit acknowledgment that Wexford discontinued valid prescriptions. A jury could also find that policymakers knew and failed to correct the practice, since Obaisi noted that he was beholden to his bosses at Wexford, presumably the policymakers who encouraged the practice.

A jury could also find that Wexford's custom was the moving force behind Flournoy's injury. For the reasons noted above, there is a genuine dispute about whether Flournoy's not receiving his eyedrops accelerated his vision loss. A jury could find that it did, and that it was Wexford's practice of not refilling prescription medicines that caused Flournoy to go without his medications for stretches of time. *See Daniel v. Cook Cty.*, 833 F.3d 728, 736 (7th Cir. 2016) (plaintiff presented "a clear link between his inadequate treatment and his injury").

Defendants argue that Wexford cannot be liable for deliberate indifference absent individual liability. The argument fails because there is a triable issue as to Obaisi's individual liability. But in any event, defendants confuse *Monell* liability with vicarious liability, *see* [80] at 13. Section 1983 does not permit vicarious liability. *Pyles*, 771 F.3d at 409. But Flournoy brings a *Monell* claim. "*Monell* liability does not always require a finding of individual liability." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016). A corporation may be liable absent individual liability where the institutional policies themselves show deliberate indifference to inmates' medical needs. *See Glisson*, 849 F.3d at 378; *Daniel*, 833 F.3d at 733–34.

Flournoy has not presented evidence from which a jury could conclude that Obaisi was a final policymaker. A final policymaker must enjoy some delegation of authority to set policy. *Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 987 (7th Cir. 2013). A prison's medical director may be the final decisionmaker as to the inmate's treatment, but "that's not nearly enough to show" that the doctor is the final policymaker. *Whiting*, 839 F.3d at 664. Flournoy testified that Obaisi was following directives from his bosses at Wexford, not creating the policy himself.

A jury could find that Wexford had a practice of not refilling prescriptions, causing Flournoy harm. Wexford's motion for summary judgment is denied.

## B. Punitive Damages

In a § 1983 action, a jury may assess punitive damages when a defendant's conduct is shown to be "motivated by evil motive or intent" or when it involves "reckless or callous indifference to the federally protected rights of others." *Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). The standard for awarding punitive damages is the same standard for § 1983 liability; both require that the defendants acted with deliberate indifference. *Woodward v. Corr. Med. Servs. of Ill.*, 368 F.3d 917, 930 (7th Cir. 2004). Defendants' argument that Flournoy cannot collect punitive damages from Obaisi's estate because there is no triable issue as to Obaisi's mental state fails. There is a genuine dispute about whether Obaisi was deliberately indifferent to Flournoy's medical needs, so a jury could find punitive damages warranted.

36

But the purpose of punitive damages is to "punish blameworthy behavior and deter defendants from committing future bad acts." *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 953 (7th Cir. 2018). Imposing punitive damages on Obaisi's estate would not serve those ends. Obaisi is deceased, so can be neither punished for his conduct nor deterred from repeating it. *See, e.g.*, *Kahlily v. Francis*, 2008 WL 5244596, at *6 (N.D. Ill. Dec. 16, 2008) (dismissing claim for posthumous punitive damages in § 1983 claim because damages could not "punish him or deter him"). Obaisi's motion for summary judgment on punitive damages is granted.[14]

Punitive damages are recoverable under § 1983 against a corporation when that corporation "had little regard for the inmates whose care it was charged with." *Woodward*, 368 F.3d at 930. Since there is a triable issue about whether Wexford had a custom or practice of withholding prescribed medicine, Wexford's motion for summary judgment on punitive damages is denied.

**C. Medical Malpractice**

To prevail on a medical-malpractice claim, Flournoy must establish that Obaisi deviated from the standard of care, and that that deviation proximately caused his injury. *Miranda v. Cty. of Lake*, 900 F.3d 335, 348 (7th Cir. 2018) (citing *Sullivan v. Edward Hosp.*, 209 Ill.2d 100, 112 (2004)). Under Illinois law, these elements must be established by expert testimony "to a reasonable degree of medical certainty." *Id.*

---

[14] Flournoy also requests punitive damages in the medical-malpractice claim, but defendants only move for summary judgment on punitive damages with regard to the § 1983 claim.

(quoting *Morisch v. United States*, 653 F.3d 522, 531 (7th Cir. 2011)); *see also Davis v. Kayira*, 938 F.3d 910, 916 (7th Cir. 2019).

The causal connection between a defendant's negligence and a plaintiff's injury must not be "contingent, speculative, or merely possible." *Johnson v. Ingalls Mem'l Hosp.*, 402 Ill.App.3d 830, 843 (1st Dist. 2010) (quoting *Ayala v. Murad,* 367 Ill.App.3d 591, 601 (1st Dist. 2006)). The proximate cause inquiry encompasses both cause-in-fact and legal cause. *Miranda*, 900 F.3d at 348. That is, to establish legal cause, a reasonable person must have been able to foresee that the plaintiff's injury would result from his conduct. *Id*. To establish cause-in-fact, the plaintiff must show that, but for the defendant's conduct, the injury would not have occurred. *Id.*

Watkins, Flournoy's expert, stated that he is "familiar with the standard of care in the field of ophthalmology diseases," and concluded, to a reasonable degree of medical certainty, that failure to provide four prescription eyedrops fell below the acceptable standard of care in treating glaucoma. That sufficiently establishes that Wexford and Obaisi's conduct fell below the acceptable standard of care for purposes of a medical-malpractice claim. Wexford and Obaisi do not challenge Watkins's qualifications or argue that he is not competent to testify as an expert, but they insist that Watkins's finding is inadequate because it is conclusory. Defendants offer no support for their assertion that expert testimony about the standard of care must meet some threshold of specificity, and, in any event, Watkins's conclusion about what the standard of care requires, and how Wexford and Obaisi deviated it, was straightforward and sufficient.

Wexford and Obaisi argue that there is no triable issue about proximate cause. As discussed above with regard to causation in the § 1983 claims, there is evidence to connect the missing eyedrops to vision loss. A reasonable person would foresee that not providing prescribed eyedrops to a patient with glaucoma would result in injury to him—the point of the prescription was to treat the disease. And Watkins's conclusions on factual causation were not speculative or merely possible—he wrote that, to a reasonable degree of medical certainty, failing to treat glaucoma, as Wexford and Obaisi apparently did, "definitely" would lead to optic nerve damage and blindness. Watkins's expert testimony would allow a jury to conclude that Obaisi's actions caused Flournoy's injury. *See Miranda*, 900 F.3d at 348 (based on experts' testimony, a jury could have found that defendants' inaction "more likely than not" contributed to plaintiff's injury). Summary judgment is denied as to the medical-malpractice claim.

## V.     Conclusion

Pfister, Kink, and Williams's motion for summary judgment is granted.[15] Obaisi's motion for summary judgment is granted on punitive damages in the § 1983 claim. There are genuine disputes of material fact about Obaisi's deliberate indifference, Wexford's practice of prematurely discontinuing inmates' prescriptions,

---

[15] The claim against warden Lamb remains pending, *see* footnote 12 above, but based on the disposition of the claims against the other IDOC defendants, it is likely that a cost-effective motion could be brought on Lamb's behalf. I will give the parties an opportunity to raise a narrow summary-judgment motion as to Lamb before setting the matter for trial.

Obaisi's liability for medical malpractice, and whether failure to provide Flournoy's eyedrops caused him vision loss. Summary judgment on those issues is denied.

ENTER:

Manish S. Shah
United States District Judge

Date: September 18, 2020